UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>JULISSA POOR BEAR,<br><br>    Defendant. | 5:16-CR-50149-JLV<br><br>REPORT AND RECOMMENDATION |

  Pending is Defendant's Motion to Suppress Evidence (Doc. 39). An evidentiary hearing was held on July 26, 2017. Defendant was personally present and represented by her attorney of record, John M. Fitzgerald. The Government was represented by Kathryn Rich. Three witnesses testified at the hearing. Five exhibits were received into evidence. Both parties have submitted briefs in support of their positions. Based on a careful consideration of all the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

## **RECOMMENDATION**

  It is respectfully recommended that Defendant's Motion to Suppress be granted.

## **JURISDICTION**

  Defendant is charged in an Indictment with Conspiracy to Distribute a Controlled Substance in violation of 21 U.S.C. §§ 846, 841(a)(1) & 841(b)(1)(A). The pending Motion was referred to the Magistrate Judge pursuant to 28

U.S.C. § 636(b)(1)(B) and Chief Judge Jeffrey L. Viken's Standing Order dated March 9, 2015.

## FACTUAL BACKGROUND

On Monday, October 24, 2017, FBI Special Agent Dan Cooper ("SA Cooper") was notified that over the weekend, Julissa Poor Bear turned herself into the jail in Kyle, South Dakota.[1] Ms. Poor Bear believed that she was receiving threats associated with the recent murder of Vinny Brewer and felt the safest place for her would be the jail. Upon turning herself in, she advised jail staff that she wished to speak with law enforcement. Ms. Poor Bear was transferred to the Adult Offenders Facility in Pine Ridge, South Dakota.

For the past 16 years, SA Cooper has been stationed in Rapid City and his special area of investigation is drug activity on the Pine Ridge Indian Reservation. SA Cooper testified that Ms. Poor Bear was a suspect in a drug conspiracy investigation and that other confidential informants provided information regarding Ms. Poor Bear's alleged involvement with drugs. At the time Ms. Poor Bear turned herself into the jail, SA Cooper already had discussions with federal prosecutors regarding the case against Ms. Poor Bear and he believed the case was ready to present to a grand jury.

When SA Cooper arrived at the jail to talk to Ms. Poor Bear, he was informed by jail staff that they called for medical care. Ms. Poor Bear was seven months pregnant, upset and agitated. SA Cooper briefly met with Ms. Poor Bear to show that he responded to her request to meet with law

---

[1] Ms. Poor Bear was aware that she has outstanding tribal warrants relating to charges of assault on an officer.

2

enforcement. Despite her condition, Ms. Poor Bear wanted to speak with SA Cooper but SA Cooper declined as he felt it best to have her medical needs addressed first.

The next day, Tuesday, SA Cooper and DCI Special Agent Dane Rasmussen ("SA Rasmussen") went to the Adult Offenders Facility and learned that Ms. Poor Bear was transported to the Indian Health Service ("IHS") hospital. Jail staff advised that they anticipated Ms. Poor Bear being returned to the jail shortly.

A certified nurse midwife, Amanda Hill, was employed at Indian Health Service and treated Ms. Poor Bear when she was brought over from the jail. Upon presenting to IHS, Ms. Poor Bear was exhibiting distress, was experiencing abdominal pains and concerned about the health of her baby. Ms. Hill testified that Ms. Poor Bear had low amniotic fluid, and was given intravenous fluids. Hospital staff monitored Ms. Poor Bear for contractions and the fetal heart rate. Ms. Hill was not the midwife who released Ms. Poor Bear the following day.

SA Cooper and SA Rasmussen went to the hospital on Tuesday morning and located Ms. Poor Bear in a hospital room. SA Rasmussen and SA Cooper described the room as a typical hospital room with a television, chairs, a hospital bed, and a bathroom. A tribal corrections officer was located outside of the room. Ms. Poor Bear was lying in the hospital bed with the headrest inclined. A nurse was present in the room and informed the officers that she

was preparing to discharge Ms. Poor Bear. The agents were aware that Ms. Poor Bear was seen for "pregnancy issues," but were unaware of the specifics.

SA Cooper and SA Rasmussen stood at the foot of the bed and talked to Mr. Poor Bear who remained lying in bed. SA Cooper and SA Rasmussen were dressed in plain clothes with their service weapons concealed. SA Cooper described Ms. Poor Bear's demeanor as much more calm and not irritated; they talked in conversational tones. When the agents arrived at the hospital, they asked Ms. Poor Bear if she felt better than yesterday. She replied in the negative. Ms. Poor Bear appeared tired and yawned frequently. Ms. Poor Bear was presented with a FBI Advice of Rights form (Exhibit 4). The <u>Miranda</u> warnings were read to Ms. Poor Bear; she acknowledged that she understood those rights; and she signed the form. Ms. Poor Bear and the agents engaged in a conversation regarding her belief that she was being threatened. The interview in the hospital room was audio recorded. (Exhibit 1). Agent Cooper testified that Ms. Poor Bear didn't appear to have trouble following his questions and provided answers responsive to his questions. SA Cooper testified that if he believed that Ms. Poor Bear was nodding off during the interview or unable to understand what was happening, he would have discontinued the interview. While agents talked to Ms. Poor Bear, medical staff entered and exited the hospital room.

The agents inquired about the individuals allegedly threatening Ms. Poor Bear. Ms. Poor Bear stated that a relative warned her that unknown persons were looking for her in relation to the recent murder of Ms. Poor Bear's former

romantic partner, Vinny Brewer. Ms. Poor Bear told agents that she was being followed by unknown vehicles, despite her evasive efforts to take backroads. Ms. Poor Bear feared potential threats from the Mexican cartel due to her prior association with Vinny Brewer, and felt the safest place to be was in jail. Ms. Poor Bear believed she could be dead if she had not reached out to law enforcements. (Exhibit 1 at 17:45). SA Cooper inquired for approximately 16 minutes about the potential threats.

SA Cooper then shifted gears to discuss Ms. Poor Bear's alleged drug involvement. (Exhibit 1 at 24:47). Ms. Poor Bear was unaware that she was being investigated and/or charged with drug offenses. Ms. Poor Bear was evasive and denied involvement with drugs. SA Cooper informed Ms. Poor Bear on numerous occasions that he was ready to present her case to a federal grand jury. (Exhibit 1 at 28:31). Frequently, he followed those statements with an implied promise of leniency. For example, he stated that, "[The grand jury] decide[s] what you get charged with, if you get charged with anything. We are there, if that makes sense. Does that have to happen? No." (Exhibit 1 at 28:38). SA Cooper informed Ms. Poor Bear that she could use the truth to her advantage to assist the prosecutor to make the "right decision" about her future. (Exhibit 1 at 31:26). On several occasions, Ms. Poor Bear expressed fear for her life given the recent murder of Vinny Brewer, and SA Cooper acknowledged the seriousness of the situation. (Exhibit 1 at 33:25-36:20; 44:21-46:52; 48:10-50:49). With this backdrop, Ms. Poor Bear gave incriminating statements. When Ms. Poor Bear gave evasive answers, SA

5

Cooper reiterated that things would go better for her if she was truthful, or that charges could be delayed. (Exhibit 1 at 43:10; 54:15; 1:00:10--1:00:57). At one point, SA Cooper told Ms. Poor Bear:

> But if you want to take advantage of this situation . . . then there is all kinds of decisions we can make. But right now the only decision we are going to make is this month I am going to go to a federal grand jury and I am going to talk about Julissa Poor Bear and everybody she is dealing with. This is what I am going to do. If you don't want that to happen, then you need to start telling us things that are truthful.

(Exhibit 1 at 56:10-56:45). A similar colloquy continued on until Ms. Poor Bear again reiterated that she summoned law enforcement out of concerns for her safety, not to provide information regarding her alleged drug activity. (Exhibit 1 at 1:05:10-1:07:54). SA Cooper also implied that Ms. Poor Bear was making the decision to be indicted by not cooperating. (Exhibit 1 at 1:09:55).

Throughout the interview, Ms. Poor Bear continuously yawned and the tone of her voice was extremely groggy. At some point during the questioning, a nurse came into the hospital room to give Ms. Poor Bear her discharge paperwork. Ms. Poor Bear was discharged and taken from her hospital room to the patrol car in a wheelchair. SA Rasmussen escorted Ms. Poor Bear out of the hospital, placed her in handcuffs in the front of her body, and transported her back to the Adult Offenders Facility. During the approximately three mile transport from the hospital to the jail, Ms. Poor Bear and SA Rasmussen continued to engage in conversation which was audio recorded. (Exhibit 2).

During the transport between the hospital and the Adult Offender's Facility, Ms. Poor Bear informed SA Rasmussen that she believed Vinny's

funeral was that taking place that day; that Vinny was the father of her unborn child; and that she would not be able to go to the funeral and give the star quilt she had gotten for him.

Once back at the jail, the agents asked Ms. Poor Bear if she wanted to continue to speak to them. Ms. Poor Bear indicated that she wanted to continue to speak with the agents. Ms. Poor Bear was taken to a room used for contact visitation at the jail. Three tables the size of card tables were located in the approximately 10 foot x 20 foot room. SA Cooper, SA Rasmussen, and Ms. Poor Bear sat at the same table. No other persons were present in the room. The doors, which contain small windows, were locked. The jail interview was also audio recorded. (Exhibit 3). The interview continued and Ms. Poor Bear gave incriminating statements. However, when the agents felt Ms. Poor Bear was omitting information, they continued with either promises of leniency or threats of prosecution. (Exhibit 3 at 39:58-46:18). Specifically, the following conversation took place:

> JULISSA POOR BEAR: If I snitch this person out, I won't get indicted?
>
> SA COOPER: No, didn't say that.
>
> JULISSA POOR BEAR: Well, that's the way I see it.
>
> SA COOPER: So let me explain it. It helps you in your case. I told you, there are some situations where people don't get charged. We have talked to people that never get charged sometimes. I am not saying that is or isn't your situation. What I am saying is, the truth sets you free.

(Exhibit 3 at 42:20-42:48). SA Cooper also suggested that her truthfulness would correlate to the length of her sentence. SA Cooper clarified that he could not guarantee that Ms. Poor Bear would not get indicted if she cooperated. Throughout the interview SA Cooper repeatedly stated or implied that by cooperating, she would receive leniency. (Exhibit 3 at 42:20-46:18). The entirety of the three interviews (hospital, transport, and jail) occurred over approximately two and a half hours.

**DISCUSSION**

The parties do not dispute that Ms. Poor Bear was in custody. Further, they do not dispute that the Miranda warning were given. Ms. Poor Bear argues that her statements must be suppressed because they were not voluntary, given law enforcement's implied promises.

**I.      Whether Ms. Poor Bear's statements were voluntary**

The burden of demonstrating that a defendant's statement was voluntary rests with the government, which must prove voluntariness by at least a preponderance of the evidence. United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004). Due process requires that confessions be voluntary. See Brown v. Mississippi, 297 U.S. 278, 285–86 (1936); see also Schneckloth v. Bustamonte, 412 U.S. 218, 225–26 (1973) (explaining that voluntary confession may be used against defendant while the use of involuntary confession offends due process). "The appropriate test for determining the voluntariness of a confession is 'whether ... pressures exerted upon the suspect have overborne his will.' " United States v. Meirovitz, 918 F.2d 1376, 1379 (8th

8

Cir.1990) (quoting United States v. Jorgensen, 871 F.2d 725, 729 (8th Cir.1989)).

Statements are involuntary if they are "extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." LeBrun, 363 F.3d at 724 (citing Simmons v. Bowersox, 235 F.3d 1124, 1132 (8th Cir. 2001)). "A statement is voluntary if it is the product of an essentially free and unconstrained choice by its maker." United States v. Anaya, 715 F.Supp.2d 916, 931 (8th Cir. 2010) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973)).

The voluntariness of a confession is judged by the totality of the circumstances. Anaya, 715 F.Supp.2d at 932. The "conduct of the officers and the characteristics of the accused" are both considered in this determination. Id. It is important to note that "[a] statement cannot be rendered involuntary by the incapacity of the defendant alone; there must be some coercive police activity." Id. (citing Colorado v. Connelly, 479 U.S. 157, 164, 167 (1986)). Furthermore, a defendant's mistaken belief that an offense cannot be prosecuted or is not prosecutable does not make a confession involuntary. LeBrun, 363 F.3d at 725.

"It is improper for a police officer to obtain a confession through an express or implied promise of lenience," but "such a promise will not render the confession involuntary unless it overcomes the defendant's free will and impairs his capacity for self determination." Smith v. Bowersox, 311 F.3d 915,

9

922 (8th Cir. 2002).  An implied or asserted promise made by law enforcement before incriminating statements are made is a factor to consider when determining the voluntariness of a statement, but it does not make the statement per se involuntary.  Id. at 922; United States v. Larry, 126 F.3d 1077, 1079 (8th Cir. 1997) (per curiam).  See also, United States v. Larrabee, 3:16-CR-30039, 2016 WL 4987122, at ¶3 (D.S.D. Sept. 14, 2016) (surveying cases where government agents breaching promises of leniency did not render confessions involuntary).

     In United States v. LeBrun, the Eighth Circuit considered whether false promises could render a confession involuntary.  363 F.3d 715 (8th Cir. 2004).  In that case, police had questioned LeBrun on four prior occasions in the fall of 1999 regarding the death of an ensign in 1968 while both LeBrun and the ensign were aboard a United States Navy vessel during the Vietnam War.  Id. at 717–18.  One year after the prior interrogations, during a fifth interrogation, LeBrun finally confessed to murder.  Id. at 726–27.  The court held that the confession was voluntary.  Id. at 727.

     On the occasion of this fifth interrogation, officers showed up at LeBrun's place of employment unexpectedly and said they wanted to question him about an investigation, not telling him that it was the matter of the ensign's death.  Id. at 718.  LeBrun mistakenly believed that he was going to be questioned about criminal allegations involving LeBrun's employer.  Id.  LeBrun rode to the police station in a police vehicle.  Id.  After arriving at the station, LeBrun was

advised that he was not under arrest and could leave at any time, but he was not given full Miranda warnings.  Id.

LeBrun was then led into a windowless interview room which police had prepared by adorning the walls with enlarged photographs of scenes from LeBrun's life.  Id.  The officers used psychological ploys against LeBrun, telling him that he was the prime suspect in the ensign's death, that the police had significant evidence that LeBrun was the killer, and that a protracted trial would drain LeBrun's financial resources and would ruin his family's reputation.  Id.  The officers also suggested, without outright promising, that LeBrun could not be prosecuted due to the passage of so much time.  They also reassured LeBrun he would not be prosecuted if he admitted the murder was spontaneous.  Id. at 725–26.  LeBrun confessed after thirty-three minutes of interrogation.  Id. at 718–19.  The court placed significant weight on the fact that LeBrun was above average intelligence, had some law training, confessed after only thirty minutes of questioning, and did not display any unique sensitivity that would indicate agents might overbear his will.  Id. at 726.  Under the totality of the circumstances, the court found the confession to be voluntary.

The Eighth Circuit has observed that "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was compelled despite the fact that law enforcement authorities adhered to the dictates of Miranda are rare."  Id. at 883 (citing United States v. Astello, 241 F.3d 965, 966 (8th Cir. 2001)).  One such rare case is United States v. Aguilar, 384 F.3d

11

520 (8th Cir. 2004). In Aguilar, the defendant was arrested and brought to the police station for questioning. Law enforcement promised Aguilar that he could leave after he confessed. He was not free to leave the police station and was subjected to two hours of questioning, with Miranda warnings given approximately one hour and forty minutes into the questioning. Aguilar was not informed that he was under arrest. During questioning, one of the agents became angry, kicked his desk, and swore at Aguilar when Aguilar did not respond in a manner anticipated by the agent. Id. at 522. In determining that Aguilar's confession was not voluntary, the Eighth Circuit pointed out the differences between Aguilar's factual situation and LeBrun. Unlike LeBrun, Aguilar did not possess any experience with the United States criminal justice system, Aguilar had only met with police once previously; Aguilar's questioning was not brief; he was questioned for more than ninety minutes before Miranda warning was given; and Aguilar was not free to leave.

     Here, the court concludes that Ms. Poor Bear's case has facts which align her case more closely with Aguilar than with LeBrun. SA Cooper repeatedly used expressed or implied promises of leniency as a means to obtain Ms. Poor Bear's incriminating statements. "It is improper for a police office to obtain a confession through an express or implied promise of lenience." Smith v. Bowersox, 311 F.3d 915, 922 (8th Cir. 2002). However, "such a promise will not render the confession involuntary unless it overcomes the defendant's free will and impairs [her] capacity for self determination." Accordingly, the court will consider the other factors turning on voluntariness.

12

Ms. Poor Bear is of legal age. Her education level is unknown. However, she was responsive to questions and gave appropriate answers indicating an understanding. She was read her Miranda rights and indicated that she understood her rights. At one point in the interview, SA Cooper reminded Ms. Poor Bear that she was free to terminate the interview at any point. Ms. Poor Bear never asked the agents to leave. On one occasion when the agents were preparing to leave, Ms. Poor Bear inquired if this was the last time she would see them again. SA Cooper and SA Rasmussen's tone throughout the interview was conversational and non-threatening. These facts weigh in favor of voluntariness.

However, a number of facts weigh heavily in favor of non-voluntariness. The first time law enforcement approached Ms. Poor Bear, she was visibly agitated, in distress, experiencing abdominal pain, and in the process of being transported from the jail to the hospital. Ms. Poor Bear was seven months pregnant. The hospital admitted Ms. Poor Bear and kept her overnight for observation. The agents were aware that she was being monitored for complications from her pregnancy, but that she was getting ready to be discharged. Medical staff was concerned with Ms. Poor Bear's low amniotic fluid and positive drug screen for amphetamines. They were monitoring her for contractions and fetal heart rate. When law enforcement approached her the next morning in her hospital bed, Ms. Poor Bear indicated that she did not feel better than she did yesterday. She said she was tired and yawned repeatedly throughout the interview. The tone of her voice was groggy. During transport

from the hospital back to the jail, Ms. Poor Bear informed SA Rasmussen that she was very tired, that she had difficulty sleeping the previous night in the hospital, and that she was experiencing the hardest pregnancy of her four previous pregnancies.  She also disclosed that she was under a lot of stress and expressed regret that she would be unable to attend Vinny Brewer's funeral which she believed was taking place that day.  She also told SA Rasmussen that Vinny Brewer was the father of her unborn son.  These factors weigh against voluntariness and indicate that Ms. Poor Bear displayed a unique sensitivity and her will was overborne.

      The record as a whole indicates that Ms. Poor Bear sought help from law enforcement because she feared for her life, not because she wanted to provide information regarding her alleged drug activities.  For the first fifteen minutes, SA Cooper asked Ms. Poor Bear about her concerns about being followed.  However, the vast majority of the time with Ms. Poor Bear was spent questioning her about her drug activities.  Even when Ms. Poor Bear attempted to resist questioning by reminding the officers that she summoned them for protection (Exhibit 1 at 1:05:17), SA Cooper indicated that he would look into Ms. Poor Bear's reports of being followed, but then dismissively stated, "you can't imagine how many people have seen Mexicans running all over this community over the last week – they are just ghost stories."  (Exhibit 1 at 1:07:30).

      SA Cooper's implied promises of leniency while giving only a cursory interest in her reports of danger, coupled with Ms. Poor Bear's compromised

14

physical and emotional state as outlined, overbore Ms. Poor Bear's free will and her capacity for self-determination was critically impaired.  The record as a whole demonstrates that the government has failed to prove by a preponderance of the evidence that Ms. Poor Bear's confession was voluntary.

## CONCLUSION

It is respectfully recommended that Defendant's Motion to Suppress (Doc. 39) be granted, because Ms. Poor Bear's statements were not voluntary.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Objections must be timely and specific in order to require de novo review by the District Court.  *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665 (8th Cir. 1986).

DATED this 9th day of October, 2017.

BY THE COURT:

_____
DANETA WOLLMANN
United States Magistrate Judge