UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JULISSA POOR BEAR,<br><br>Defendant. | CR. 16-50149-01-JLV<br><br>ORDER |

## INTRODUCTION

A grand jury returned an indictment alleging defendant Julissa Poor Bear conspired to distribute a controlled substance in violation of federal law. (Docket 1). Defendant filed a motion to suppress statements she made to law enforcement. (Docket 39). The suppression motion was referred to the magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and the standing order dated March 9, 2015. Magistrate Judge Daneta Wollmann conducted a hearing on the motion and issued a report and recommendation concluding defendant's motion should be granted. (Dockets 70 & 73).

Under the Federal Magistrate Act, 28 U.S.C. § 636(b)(1), if a party files written objections to the magistrate judge's proposed findings and recommendations, the district court is required to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." Id. The court may "accept,

reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Id.

The government filed objections to the report and recommendation. (Docket 76). As set forth by the government, the objections target four points:

1. The Magistrate Judge's conclusion that "the government has failed to prove by a preponderance of the evidence that Ms. Poor Bear's confession was voluntary."

2. The Magistrate Judge's conclusion that its factual findings supported a recommendation the defendant's statements were not voluntary.

3. The Magistrate Judge's finding that statements by the agents constituted express or implied promises of leniency.

4. The Magistrate Judge's finding that the defendant's will was overborne.

Id. at pp. 1-2 (internal citations omitted). The government "concurs with the [report and recommendation's] factual findings except as specifically referenced" in its objections. Id. at p. 2.

The court details its factual findings below. To the extent they do not align with the government's view of the facts, the government's objections are overruled.

**FACTS**

In late October 2016, defendant turned herself into the jail in Kyle, South Dakota, because she believed people in the area planned to kill her. She was placed in custody because she had an outstanding tribal arrest warrant. (Docket 73 at p. 2). Then she was transferred to the Adult Offender's Facility ("AOF") in Pine Ridge. Id.

Dan Cooper ("SA Cooper") is a Special Agent with the Federal Bureau of Investigation.  Id.  His investigations focus on drug activity on the Pine Ridge Indian Reservation.  Id.  Soon after defendant was taken into custody in Kyle, SA Cooper received notice.  Id.  SA Cooper had been investigating defendant: she was a suspect in a drug conspiracy, informants discussed defendant's drug activity with law enforcement and SA Cooper had begun working with federal prosecutors on presenting to a grand jury the information on defendant.  Id.

SA Cooper went to meet with defendant at the AOF, but medical problems arose for her, possibly because she was in the seventh month of her pregnancy.  Id. at pp. 2-3.  Although the agent and defendant interacted briefly, defendant's condition prohibited a full discussion.  Id. at p. 3.

SA Cooper returned to the AOF the following day with Dane Rasmussen ("SA Rasmussen"), who is a Special Agent with the South Dakota Division of Criminal Investigation.  Id.  AOF staff indicated defendant was admitted to the Indian Health Service hospital.  Id.  The agents went to the hospital.  Id.

Before the agents arrived, the hospital admitted defendant based on her signs of distress and abdominal pains.  Id.  A certified nurse midwife treated defendant and testified defendant had low amniotic fluid and she provided defendant with intravenous fluids.  Id.

The agents reached defendant in her hospital room that morning. Id. They did not know the specifics of defendant's medical problems, but they believed it related to her pregnancy. Id. at p. 4. Wearing plain clothes and with their weapons concealed, the agents began questioning defendant, who was on her back in a hospital bed with the headrest inclined. Id. at pp. 3-4. The agents asked whether she felt better than the day before, and she indicated she did not feel better. Id. at p. 4. The agents presented defendant with a form setting out her Miranda[1] rights. She communicated she understood the rights and signed the form. Id. The agents discussed defendant's concern for her personal safety, and they interrogated her on her drug activity. Id. at pp. 4-6. The interactions lasted approximately one hour. Defendant was tired and yawned throughout the discussion and interrogation. Id. at p. 4. The tone of each person was generally calm and conversational. Id. Defendant understood the agents' questions and provided responsive answers. Id.

The agents began by explaining to defendant she was a suspect in an ongoing investigation and they were prepared to bring information on her to a grand jury. (Exhibit 1 at 6:00-8:00). Then the agents provided defendant with an opportunity to explain why she believed her life was in danger. According to defendant, four unknown men driving a black vehicle with Colorado license plates visited the house of defendant's

---

[1]Miranda v. Arizona, 384 U.S. 436 (1966).

Aunt, asking for defendant.  Id. at 8:00-22:00.  Defendant's Aunt warned defendant to be careful because she believed the four men were responsible for the recent murder of Vinny Brewer, defendant's former romantic partner and the man she believed was the father of her unborn child.  Id.; see also Exhibit 2.  Shortly after, when defendant was driving, she noticed a black car behind her that she believed was following her because she attempted to lose the car on backroads but was unsuccessful.  (Exhibit 1 at 8:00-22:00).  Defendant asserted she spoke on the phone to her sister-in-law, who encouraged her to go to the jail for safety.  Id.  Defendant safely reached the Kyle jail and turned herself in. Id.  Defendant believed her life was in jeopardy.  Id. ("I am like, I could have been dead by now, but before that I called them to, like right after my auntie told me they were looking for me.").

After defendant explained her safety concerns, the agents began interrogating her about her suspected drug activity.  Id. at 24:00-26:00. During the interrogation, which comprises the remainder of the interactions in the hospital room, SA Cooper made comments regarding defendant's truthfulness and the status of their drug investigation.  SA Cooper's comments include:

- You say you haven't dealt with any Hispanics or Mexicans or anything and that is not true, okay?  We know those things.  So we need to start addressing it.  Okay?  The best way now is to start, you are not charged right now federally, okay?  We can start that process.  And we go talk to our prosecutor and we can say—we talked to Julissa.  Okay, she was truthful with us, we can use those things to your advantage.

5

- But I can guarantee you this—we know enough that <u>I am going to be presenting your case to a federal grand jury. That is how that works. They decide what you get charged with, if you get charged with anything. We are there, if that makes sense. Does that have to happen? No.</u> But if we walk out of here today and all we talk about is that Julissa is lying to us about not being involved, then obviously what do you think we have to do, we have to proceed forward with that, correct?

- Because the bottom line is right now, if we continue this conversation at the jail or you don't want to anymore and we walk away, we are going to have to take what you tell us and proceed forward. <u>Right now you haven't told us what the federal prosecutor is going to want to know. The fact of the matter is does Julissa Poor Bear do this thing 100 percent so we can either consider maybe delaying charges against her</u> because there may be more help that we can do for the community with things we know.

- But if you want to take advantage of this situation, this time you are spending with us and tell us the truth, okay, then there is all kinds of decisions we can make. But right now the only decision we are going to make is this month <u>I am going to go to a federal grand jury and I am going to talk about Julissa Poor Bear and everybody she is dealing with.</u> That is what I am going to do. <u>If you don't want that to happen, then you need to start telling us things that are truthful.</u>

- But just understand what the reality of that is, what your future is going to bring. <u>We are going to charge people with things like this, okay, ten year mandatory minimum federal prison sentence.</u> What that means is if you are convicted, <u>if you are convicted, you would have to go to prison for ten or more years</u>. . . . <u>The only way to get below that is to be truthful about it so that the federal prosecutor can tell the judge okay, we don't want somebody like Julissa Poor Bear to be sentenced to ten years or more; we want you to be able to sentence her below that. The only way that happens is truth coming out of Julissa Poor Bear's mouth.</u>

- <u>Right now, as we walk away, okay, October 25th is going to be the day Julissa Poor Bear decided she wanted to be federally indicted.</u> Okay? That is what is happening here. I think you understand that. If you are comfortable with that, that is fine.

<u>Id.</u> at 24:00-1:05:00 (emphasis added).

While the agents interrogated her, defendant reiterated her fear of being killed by the people she believed were looking for her. Id. at 35:00-1:06:00. In response, the agents probed about the reasonableness of her fear, but they also supported her view that the entire situation was a serious matter and the safety of her and her family was important. Id. In urging defendant's truthfulness, SA Cooper brought up the subject of the safety of defendant's family:

- SA Cooper:
  - The fact of the matter is, there are people in jail. There's people that are charged. There are people that are going to get charged. And the only way, I got to assume that Julissa, you and your family are who you want to take care of. Right? That is your priority.
- Defendant:
  - And then me and my family are in danger.
- SA Cooper:
  - Well, but again, I got to go back to that again. Do you really feel that you are in danger? Is there a reason that you are in danger?
- Defendant:
  - From what [my sister-in-law] say, I mean, they are just out to get and take over, out to take over.
- SA Cooper:
  - Okay. So why would that put you in danger?
- Defendant:
  - Because they are killing people.

Id. at 40:00-47:00.

- SA Cooper:
  - We talk to Julissa Poor Bear, we talk to dozens upon dozens of other people who know what is going on. That is how we deal with it. You want to call it snitching—fine, but they are things that we have to do. So you got to decide right now whether you want to talk to us truthfully to help Julissa and her family or do you want us to just go about our business.
- Defendant:
  - But I came here for a whole different reason.

- SA Cooper:
  - Exactly, and we talked about that, right?
- Defendant:
  - That was the main issue and now it is not even an issue, it is not even nothing.

Id. at 1:00:00-1:08:00.

The hospital discharged defendant, and she was handcuffed and brought to the agents' vehicle in a wheelchair. (Docket 73 at p. 6). The agents transported defendant back to the AOF, where she agreed to speak with them further. Id. at pp. 6-7. When they returned to the AOF, they entered a room used for contact visitation measuring approximately 10 by 20 feet and sat together at a table. Id. at p. 7. Defendant made statements about her drug activity for approximately the first 15 minutes of this interrogation. (Exhibit 3). Once the agents began to feel as though defendant was not telling the truth, SA Cooper made comments similar to those quoted above:

- We know how Julissa Poor Bear can help herself out, by being truthful. Okay? Because if we—we already know some of those things. So it is what it is. But how do you get below that ten year thing that we were talking about? How do you get possibly not even charged? And I'm not saying that that's even a possibility, decisions that we don't make. A federal prosecutor is going to make some of those decisions. But she's going to make some of those decisions based upon—we've decided to come talk to you.

- Either way, it's a decision that you're making, okay? The situation ain't going to get any worse than a ten year mandatory minimum, which I already told you that we're willing to charge you with. Okay? It's not going to get much worse than that. Okay?
- If you don't wish to talk to us honestly, we are going to come back with an arrest warrant. We are going to come back with an indictment. We are going to come back having charged you with what we told you we are going to charge you with.

Id. at 17:30-48:00 (emphasis added).

Defendant and SA Cooper had two back-and-forth exchanges

related to these quoted sections:

- SA Cooper:
    - How this works, we need to go to the federal prosecutor and say you know what, she just opened up and she was truthful. Did she tell us everything? No. But everything she did tell us was truthful. That is a start. That is when the federal prosecutor can start making her decisions. To your point, what if I don't want that to happen? You just said it, I don't want that to happen. We have no choice at this point. We have worked this case long enough, we have started the process to start indicting people. You are on the short list to be one of the ones that are next. That is where we are going. Dane told you today helped a little bit, but the fact of the matter is, you told us some things that were truthful, but you lied about other things.
- Defendant:
    - If I snitch this person out, I won't get indicted?
- SA Cooper:
    - No, didn't say that.
- Defendant:
    - Well, that is the way I see it.
- SA Cooper:
    - So let me explain it. It helps you in your case. I told you, there are some situations where people don't get charged. We have talked to people that never get charged sometimes. I am not saying that is or isn't your situation. What I am saying is, the truth sets you free.

Id. at 40:00-50:00.

- SA Cooper:
    - But in a scenario where you are looking at a case where you could get ten years or more in prison, who is the one person, I think you understand it now, who is the one person that can get you reduced from that ten years, all the way down to potentially not being charged? Who is the one person that can do that? We can't do the work for that person. Who is the one person that can do that? In your situation, who is the one person that can help Julissa Poor Bear?
- Defendant:
    - Me.

- SA Cooper:
  - Just you, okay.  So you understand that.  And what we are telling you is in these cases, the gamut exists where you can be charged with the max, sentenced to the max, or you cannot be charged at all.  There's this huge window.  There's only one person who really decides how that works out in the end, okay.  And would you rather walk in the door, if you are going to get charged, having told the truth and walk in the door and say—hey, you guys owe me because I told you the truth, even though the federal prosecutor decided to charge you, that we could start working downward from wherever you are at.  You are the one that starts that.

Id.

Following these exchanges, defendant stated she did not understand the situation "100 percent," partly because she "ha[d] never dealt with this" set of circumstances.  Id. at 50:00-53:00.  Less than one month later, a grand jury indicted defendant.  (Docket 1).

**ANALYSIS**

To comport with the Fifth Amendment, defendant's statements must be voluntary.  See United States v. Williams, 720 F.3d 674, 690-91 (8th Cir. 2013).  "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination."  United States v. Mshihiri, 816 F.3d 997, 1004 (8th Cir. 2016), cert. denied, 137 S. Ct. 319 (2016) (internal quotation marks omitted).  "The government bears the burden of persuasion and must prove by a preponderance of the evidence the voluntariness of the challenged statements."  Williams, 720 F.3d at 691 (internal quotation marks omitted).

"To determine whether a confession is voluntary, [courts] look at the totality of the circumstances, examining both the conduct of the officers and the characteristics of the accused." United States v. Vega, 676 F.3d 708, 718 (8th Cir. 2012) (internal quotation marks omitted). "The [United States] Supreme Court has long indicated that one of the key concerns in judging whether confessions were involuntary, or the product of coercion, was the intelligence, mental state, or any other factors possessed by the defendant that might make him particularly suggestible, and susceptible to having his will overborne." Wilson v. Lawrence Cty., 260 F.3d 946, 952 (8th Cir. 2001).

"A statement cannot be rendered involuntary by the incapacity of the defendant alone; there must be some coercive police activity." United States v. Anaya, 715 F. Supp. 2d 916, 931-32 (D.S.D. 2010) (citing Colorado v. Connelly, 479 U.S. 157, 164, 167 (1986)). "It is improper for a police officer to obtain a confession through an express or implied promise of leniency." Smith v. Bowersox, 311 F.3d 915, 922 (8th Cir. 2002). However, in the United States Court of Appeals for the Eighth Circuit, officers may "elicit confessions through a variety of tactics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices. . . . unless the overall impact of the interrogation caused the defendant's will to be overborne." United States v. Brave Heart, 397 F.3d 1035, 1041 (8th Cir. 2005) (internal quotation marks and citations omitted).

11

"The court considers, among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition. Whether a defendant received *Miranda* warnings only moments before he made his incriminating statements . . . is a consideration the Supreme Court has treated as important, although not dispositive, in determining voluntariness." <u>Vega</u>, 676 F.3d at 718 (internal alterations, citations and quotation marks omitted).

The magistrate judge determined SA Cooper employed implied promises of leniency to obtain defendant's statements. (Docket 73 at p. 12). Based on that conclusion, the magistrate judge analyzed the circumstances surrounding defendant's statements to determine what factors supported finding the statements were voluntary and what factors did not. <u>Id.</u> at pp. 13-15. The magistrate judge found several factors weighed in favor of the statements' voluntariness: defendant's legal age; her responsive answers; receiving her <u>Miranda</u> rights early and understanding them; her decision not to terminate the interrogation; and the conversational tone of her interactions with the agents. <u>Id.</u> at p. 13. However, the magistrate judge concluded these factors were heavily outweighed by the circumstances supporting the determination that defendant's statements were not voluntary. <u>Id.</u> at pp. 13-15. Those circumstances included defendant's compromised physical and emotional state due to her belief her life was in grave danger and her health complications arising from her seven-month pregnancy. <u>Id.</u>

In its objections, the government argues the agents never made express or implied promises of leniency to defendant. (Docket 76 at pp. 2-5). The government claims SA Cooper never impliedly promised leniency because the context of the interactions shows "he explained to the defendant how drug investigations can progress and informed her the status of her location." Id. at p. 4. The government does not object to the factors the magistrate identified as supporting the voluntariness of defendant's statements. Id. at p. 6. The government claims defendant's prior involvement with the justice system weighs in favor of voluntariness. Id. at p. 7. According to the government, nothing about defendant's medical conditions made her uniquely sensitive to having her will overborne. Id. at p. 8. The government also asserts the agents properly and sufficiently addressed defendant's personal safety concerns. Id. at pp. 7-8.

## I. Promise

The government correctly points out SA Cooper did not expressly promise defendant leniency in exchange for confessing. But the government's argument on whether he made implied promises is not convincing. In the government's view, SA Cooper did no more than explain how "defendant was at a 'crossroads', meaning there were alternatives available for the case direction, which could be impacted by the defendant's decisions." (Docket 76 at pp. 4-5).

Early in the interrogation, SA Cooper established that defendant had yet to be indicted, but charges were on the horizon. See supra Facts at p. 5 ("The best way now is to start, you are not charged right now federally, okay? We

13

can start that process.  And we go talk to our prosecutor[.]").  Then he began

describing his role in presenting the case to a grand jury to obtain an

indictment naming defendant.  Id. ("I am going to be presenting your case to a

federal grand jury.  That is how that works.  They decide what you get charged

with, if you get charged with anything.  We are there, if that makes sense.

Does that have to happen?  No.").  SA Cooper suggested he could delay an

indictment against defendant.  Id. at p. 6 ("Right now you haven't told us what

the federal prosecutor is going to want to know.  The fact of the matter is—does

Julissa Poor Bear do this thing 100 percent so we can either consider maybe

delaying charges against her[.]").  He directly stated that if she provided certain

information, he would not present the case against her to a grand jury.  Id. ("I

am going to go to a federal grand jury and I am going to talk about Julissa Poor

Bear and everybody she is dealing with.  That is what I am going to do.  If you

don't want that to happen, then you need to start telling us things that are

truthful.").

Any reasonable person—aware that getting indicted was likely, told that

the indictment could be delayed or prevented by telling an agent what he wants

to hear—would understand SA Cooper as impliedly promising leniency in

exchange for a confession.  The implication amplified when SA Cooper spoke of

defendant's confession in conjunction with a potential mandatory minimum

sentence.  Id.  ("[I]f you are convicted, you would have to go to prison for ten or

more years. . . .   The only way to get below that is to be truthful about it so

that the federal prosecutor can tell the judge okay, we don't want somebody

like Julissa Poor Bear to be sentenced to ten years or more; we want you to be able to sentence her below that. The only way that happens is truth coming out of Julissa Poor Bear's mouth."). Based on the totality of the circumstances, SA Cooper impliedly promised leniency in the form of no indictment or a lower sentence if defendant would confess.[2] "It [is] improper . . . to use this deceptive promise of leniency in the course of the interrogation." Smith, 311 F.3d at 922-23 (discussing law enforcement promising lighter punishment).

The magistrate judge's report and recommendation is adopted on this issue and the government's objections are overruled.

## II. Effect

The next issue is what effect SA Cooper's promises had on defendant. Specifically, whether "the overall impact of the interrogation caused the defendant's will to be overborne." See Brave Heart, 397 F.3d at 1041. The court finds the magistrate judge properly determined the factors weighing in favor of concluding defendant's statements were voluntary. See supra Analysis at p. 12. The court finds unpersuasive the government's arguments on whether other factors support or undercut the voluntariness of defendant's statements.

Based on SA Cooper's testimony that he was aware defendant had prior convictions, the government claims defendant had familiarity with the criminal

---

[2]It is unavailing for the government that SA Cooper framed his request to defendant as one for the truth as opposed to an incriminating confession. The interrogation audio recording makes it clear that, from SA Cooper's perspective, a full-scale confession from defendant would be the truth and anything less would not.

justice system.  (Docket 76 at p. 7) (citing Docket 74 at p. 66).  Although that may be evidence of general familiarity, defendant stated during the interrogation she did not understand the situation "100 percent" because she had "never dealt with this" set of circumstances before.  See supra Facts at p.10.  The court finds this factor is neutral.  This is unlike other cases where suspects understand the criminal justice system or even have legal education.  See United States v. LeBrun, 363 F.3d 715, 726 (8th Cir. 2004) (deciding to "place substantial weight on the fact that [the defendant] was a sophisticated individual with legal training.").

The government's reasoning on the role of defendant's safety concerns and her medical problems misses important connections regarding her "mental state[ and] other factors [she] possessed . . . that might make [her] particularly suggestible, and susceptible to having [her] will overborne."  See Wilson, 260 F.3d at 952.  Defendant made it clear at the beginning of the interactions that she believed her life was in jeopardy.  Although the agents may have had legitimate doubts about the threat on defendant's life, she sincerely expressed her concerns and they were not outlandish.  Defendant turned herself into the Kyle jail to protect herself.  In her mind, law enforcement could keep her safe.  SA Cooper's statements urging truthfulness from defendant while also bringing up her safety concerns fostered the idea that being on law enforcement's side would provide safety.  See supra Facts at p. 7 ("There are people that are going to get charged.  And the only way, I got to assume that Julissa, you and your family are who you want to take care of.  Right?  That is your priority. . . . So

you got to decide right now whether you want to talk to us truthfully to help Julissa and her family or do you want us to just go about our business.").  The implication SA Cooper's remarks established was that some connection existed between defendant confessing and the threat to her and her family—and that failing to confess could mean the threat would persist.  This made defendant "particularly suggestible, and susceptible to having [her] will overborne."  See Wilson, 260 F.3d at 952.

Defendant's medical condition compounded her susceptibility. Defendant was fatigued, seven months pregnant and suffered medical problems severe enough to be admitted to the hospital and receive intravenous fluids.  She was on her back in a hospital bed as the two agents stood before her.  This case is not as severe as Mincey v. Arizona, where Mr. Mincey was "seriously wounded" and showed confusion.  437 U.S. 385, 398-99 (1978). "Mincey was being questioned [while] he was lying on his back on a hospital bed, encumbered by tubes, needles, and breathing apparatus.  He was, in short, 'at the complete mercy' of [law enforcement], unable to escape or resist the thrust of [the detective's] interrogation."  Id. at 399 (quoting Beecher v. Alabama, 389 U.S. 35, 38 (1967)).  While not exactly like Mincey, defendant's position in the hospital bed with her medical condition critically diminished her ability "to escape or resist the thrust of [the agents'] interrogation."  See id.

Appreciating the totality of the circumstances, defendant's personal safety concerns and her medical state significantly undercut the argument that her statements were voluntary.  The magistrate judge's report and

recommendation is adopted on this issue and the government's objections are overruled.

The government alone must carry its "burden of persuasion and must prove by a preponderance of the evidence the voluntariness of the challenged statements." Williams, 720 F.3d at 691 (internal quotation marks omitted). It has not done that. Based on the totality of the circumstances—with special focus on SA Cooper's implied promises of leniency, defendant's safety concerns and her medical condition—defendant's statements in her hospital room were not voluntary. Law enforcement elicited defendant's statements in violation of the Fifth Amendment because they overbore her will and critically impaired her capacity for self-determination. See Mshihiri, 816 F.3d at 1004. Whether defendant made voluntary statements after the hospital discharged her requires more analysis.

### III. Post-hospital

After the hospital released defendant, the agents handcuffed her and transported her to the AOF for further questioning. Defendant and the agents interacted during the short drive, and the defendant agreed to continue answering the agents' questions. Defendant offered a series of statements at the beginning of the interrogation at the AOF without the agents applying the pressures delineated above.

"The Supreme Court has held that a confession obtained after a coerced confession is admissible if the subsequent confession was given voluntarily."

Rabbani v. Obama, 656 F. Supp. 2d 45, 52-53 (D.D.C. 2009) (citing Lyons v.

Oklahoma, 322 U.S. 596, 603 (1944)).  The Lyons Court stated:

> [T]he fact that the earlier statement was obtained from the prisoner by coercion is to be considered in appraising the character of the later confession. The effect of earlier abuse may be so clear as to forbid any other inference than that it dominated the mind of the accused to such an extent that the later confession is involuntary. If the relation between the earlier and later confession is not so close that one must say the facts of one control the character of the other, the inference is one for the triers of fact and their conclusion, in such an uncertain situation, that the confession should be admitted as voluntary, cannot be a denial of due process.

Lyons, 332 U.S. at 603.

"In assessing the voluntariness of the subsequent confession, 'the time

that passes between confessions, the change in place of interrogations, and the

change in identity of the interrogators all bear on whether that coercion has

carried over into the second confession.' "  Rabbani, 656 F. Supp. 2d at 53

(quoting Oregon v. Elstad, 470 U.S. 298, 310 (1985)).  "The Supreme Court has

held that even in situations in which days pass between confessions, during

which the suspect disavows his prior statement, the prior coerced confession

can still taint the subsequent confession."  Id. (citing Clewis v. Texas, 386 U.S.

707, 710-12 (1967)).

Under the applicable law, the court finds defendant's statements

following the interview at the hospital were not voluntary.  Once the hospital

discharged defendant, the agents continued interacting with her on the drive to

the AOF, seamlessly transitioning to the approximately one-hour interrogation

at the AOF.  With little to no time "pass[ing] between confessions," this factor

supports finding defendant's post-hospital statements were involuntary.  See

Elstad, 470 U.S. at 310.  The "change in place of interrogations" supports a

finding of voluntariness.  See id.  However, the lack of a "change in identity of

the interrogators" reinforces the coercive nature of the prior questioning in the

hospital.  See id.  Maybe most informative, only approximately 15 minutes

passed before SA Cooper began employing the tactics he used at the hospital.

This included remarks about defendant's truthfulness embedded with

comments on the possibility of her not getting indicted or receiving a prison

sentence below a mandatory minimum.[3]  See supra Facts at pp. 8-10.  Toward

the end of the second interrogation, SA Cooper's stated "snitching" would not

mean an indictment would not follow.  See id.  That remark is of little

significance because it came after nearly two hours of questioning where law

enforcement made implied promises of leniency indicating confessing would

directly impact whether charges follow and a possible sentence.  The damage

was done.  Law enforcement violated the Fifth Amendment in obtaining

statements from defendant after she left the hospital.

## ORDER

Based on the above analysis, it is

ORDERED that the government's objections to the magistrate judge's

report and recommendation (Docket 76) are overruled.

---

[3]These remarks from SA Cooper are admittedly less clear than the earlier implied promises.  But in light of the "deceptive promise of leniency" in the prior interrogation, lack of clarity does not make these remarks appropriate. See Smith, 311 F.3d at 923.

IT IS FURTHER ORDERED that the magistrate judge's report and recommendation (Docket 73) is adopted in full.

IT IS FURTHER ORDERED that defendant's motion to suppress (Docket 39) is granted.

IT IS FURTHER ORDERED that a scheduling order will follow.

Dated January 17, 2018.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
CHIEF JUDGE